**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANGAMO THERAPEUTICS, INC. | ) | Case No. 26-10989 (CTG) |
| Debtor.[1] | ) | **Obj. Deadline**: **November 4, 2026 at 4:00 p.m. (ET)**<br>**Hearing Date**: **November 23, 2026 at 10:00 a.m. (ET)** |

**MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) EXTENDING THE EXCLUSIVE PERIODS TO FILE AND SOLICIT ACCEPTANCES OF A CHAPTER 11 PLAN AND (II) GRANTING RELATED RELIEF**

Sangamo Therapeutics, Inc., as debtor and debtor-in-possession (the "**Debtor**") in the above-captioned case, hereby files this motion (this "**Motion**") and respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. The Debtor commenced this Chapter 11 Case with a singular objective of maximizing value. Consistent with that objective, prior to the Petition Date, the Debtor entered into two stalking horse purchase agreements and secured debtor-in-possession financing that would provide the runway necessary to complete a post-petition marketing and sale process. Immediately upon commencement of this Chapter 11 Case, the Debtor sought approval of bidding procedures that contemplated both asset sales and plan sponsor alternative transactions that would allow the Debtor to implement a comprehensive strategy designed not only to monetize the Debtor's assets, but to maximize value from all available sources for the Debtor's estate.

2. That strategy has already generated significant value. The Debtor's asset sales thus far generated cash proceeds in excess of $163 million, plus an additional $100 million in milestone

[1] The debtor and the last four digits of its taxpayer identification number are: Sangamo Therapeutics, Inc. (9556). The debtor's mailing address is 7000 Marina Blvd, Brisbane, CA 94005.

[2] Capitalized terms used in this preliminary statement have the meanings given to them elsewhere in this Motion.

payments. As a result, the estate is solvent: the Debtor will satisfy all allowed administrative, priority, and general unsecured claims in full.

3. The Debtor is now focused on evaluating opportunities to further maximize value for the Debtor's estate, including through a sale of its remaining assets, as well as through a plan sponsor transaction and other restructuring alternatives that may preserve up to approximately $980 million[3] in net operating loss carryforwards for the benefit of existing equity. In late August, the Debtor, the Equity Committee, the Creditors' Committee, and the Debtor's DIP Lender, Future Solution Investments LLC ("**FSI**"), engaged in hard-fought and good-faith negotiations regarding the extension of the bid deadline for the sale of the Debtor's remaining assets and receipt of plan sponsor alternative proposals. Ultimately, and to allow the Debtor to maintain maximum flexibility to ensure that it receives the best offer available that will generate the greatest recovery for its equity holders, the parties agreed to a timeline for marketing and evaluating additional proposals that would permit the Debtor to receive bids on the remaining assets and Plan Sponsor Alternative Bids through and including the confirmation of a chapter 11 plan.

4. Pursuant to that process, the Debtor and the Equity Committee engaged in good-faith, arm's-length negotiations with FSI with respect to FSI's plan sponsor alternative bid. The Debtor and the Equity Committee engaged in multiple rounds of counter proposals in an effort to improve the economic recovery to equity holders through FSI's proposal. However, by late September it became clear that achieving consensus among the Debtor, FSI, and the Equity Committee with respect to the terms of an FSI plan sponsor transaction would not be possible and the Debtor determined that proceeding with FSI's proposal on a non-consensual basis would likely

---

[3] The approximately $980 million of net operating losses referenced herein reflects the Debtor's net operating losses prior to giving effect to any reduction resulting from gains recognized in connection with the asset sales.

result in costly and protracted litigation to the detriment of stakeholders and would not be in the best interests of the estate.

5. In parallel, the Debtor continued to market its remaining assets and engage with potential plan sponsors, and the Equity Committee, with the Debtor's support and full cooperation, has engaged in significant additional marketing efforts for plan sponsor bids and other reorganization alternatives. These efforts have generated interest from additional parties, several of whom have entered into confidentiality agreements and are actively engaged in discussions with the Debtor and the Equity Committee regarding potential transaction opportunities.

6. Throughout this process, the Debtor and the Equity Committee have continued to engage in constructive discussions regarding the terms of a chapter 11 plan with the goal of identifying a value-maximizing path forward that will permit the Debtor and the Equity Committee to submit a jointly proposed plan. These discussions with the Equity Committee remain productive and have accelerated in recent days. Notably, the Debtor and the Equity Committee arranged an in-person, multi-hour meeting among the Debtor's management and all members of the Equity Committee that occurred on October 14, 2026 in Cooley's New York offices. At that meeting, the Debtor expressed its support for the development of transaction alternatives that maximize value for all stakeholders and have the support of the Equity Committee. On the basis of this support, the Equity Committee agreed not to oppose the relief sought in this Motion.

7. Against this backdrop, and in light of both the substantial progress achieved to date and the work that remains, cause exists to extend the periods within which the Debtor may exclusively file and solicit acceptances of a chapter 11 plan in order to advance, in an orderly manner, the remaining work necessary to develop a value-maximizing chapter 11 plan. To further that goal, the Debtor and the Equity Committee have agreed to consensually pursue

value-maximizing outcomes on behalf of the Debtor's estate, its creditors, and equity holders, including by building consensus with other stakeholders and parties in interest where possible. In light of the current state of collaboration between the Debtor and the Equity Committee, extending the Debtor's Exclusivity Periods will afford the parties the opportunity to bring these efforts to fruition while avoiding the additional expense and potential disruption associated with competing plan processes, which could diminish the value ultimately available to equity holders.

8. For these reasons and those set forth below, the Debtor respectfully requests that the Court extend the Exclusivity Periods and grant the relief requested herein.

## RELIEF REQUESTED

9. By this Motion, the Debtor seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"): (i) extending the Debtor's Exclusivity Periods[4] (as defined below) to file a chapter 11 plan and to solicit acceptances of such plan each by approximately sixty days to December 23, 2026 and February 24, 2027, respectively, and (ii) granting related relief.

## JURISDICTION AND VENUE

10. The United States Bankruptcy Court for the District of Delaware (this "**Court**") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012 (Sleet, C.J.). This is a core proceeding under 28 U.S.C. § 157(b). Venue of this Chapter 11 Case (as defined below) and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

---

[4] Pursuant to rule 9006-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the filing of this Motion prior to the expiration of the current Exclusivity Periods automatically extends the Exclusivity Periods until such time as the Court rules on this Motion. *See* Del. Bankr. L.R. 9006-2.

11. The statutory predicates for the relief requested herein are section 1121(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), rule 9006(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 9006-2.

12. Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order or judgment with respect to this Motion if it is determined that the Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## BACKGROUND

### A. General Background

13. On June 23, 2026 (the "**Petition Date**"), the Debtor commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code (this "**Chapter 11 Case**"). The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 2, 2026, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors in this Chapter 11 Case (the "**Creditors' Committee**").[5] On August 5, 2026, the U.S. Trustee appointed the Official Committee of Equity Holders in this Chapter 11 Case (the "**Equity Committee**").[6] To date, no request has been made for the appointment of a trustee or examiner in this Chapter 11 Case.

14. Additional factual background and information regarding the Debtor, including its business operations, its corporate and capital structure, and the events leading to the commencement of this Chapter 11 Case, are set forth in detail in the *Declaration of Scott B. Willoughby in Support of Chapter 11 Petition and First Day Motions* [Docket No. 2].

---

[5] The U.S. Trustee filed two notices amending the membership of the Creditors' Committee following its appointment. *See* Docket No. 491 & 496.

[6] On September 16, 2026, the U.S. Trustee filed a notice amending the membership of the Equity Committee. *See* Docket No. 457.

## B. The Debtor's Successful Transition to Chapter 11

15. During the initial months of this Chapter 11 Case, the Debtor worked diligently to facilitate its smooth transition into chapter 11, address issues relating to its available liquidity, and timely fulfill the administrative requirements of this Chapter 11 Case, including, among other things:

- ***"First Day" and "Second Day" Relief***. Obtaining important procedural and operational "first day" and "second day" relief to maintain ordinary course operations and facilitate an orderly administration of this Chapter 11 Case;

- ***DIP Financing***. Negotiating and obtaining, on a consensual basis, Court approval of (a) the debtor-in-possession financing facility (the "**Original DIP Facility**") with Northridge ATM, LLC on an interim basis [Docket No. 63] and (b) a replacement debtor-in-possession financing facility (the "**Replacement DIP Facility**") with FSI (in such capacity, the "**DIP Lender**"), which materially improved the economic and non-economic terms of the Original DIP Facility, on an interim basis [Docket No. 176] and on a final basis (the "**Final Replacement DIP Order**") [Docket No. 360];

- ***NOL Preservation***. Preparing, filing and obtaining approval of the Debtor's motion to establish notice and objection procedures for certain transfers of, or certain claims of worthlessness for federal or state tax purposes with respect to, equity securities in the Debtor or any beneficial interest therein to preserve the Debtor's tax attributes, including net operating losses during this Chapter 11 Case [Docket No. 135];

- ***Lease Rejection***. Preparing, filing, and obtaining approval of the Debtor's motion seeking authority to reject two unexpired leases in Richmond, California and to abandon any remaining property of inconsequential value at the leased premises, effective as of June 30, 2026 [Docket No. 141];

- ***Creditor Meetings***. Participating in a meeting of creditors and equity security holders pursuant to section 341 of the Bankruptcy Code;

- ***Bar Date Order***. Preparing, filing, and obtaining court approval of procedures and deadlines for filing proofs of claim [Docket No. 209];

- ***Statutory Reporting***. Coordinating with the U.S. Trustee to provide requested information on a variety of issues and complying with all reporting requirements under the Bankruptcy Code, including preparing and filing the Debtor's schedules of assets and liabilities and statements of financial affairs [Docket Nos. 158, 159], monthly operating reports [Docket Nos. 268, 427], and Bankruptcy Rule 2015.3 periodic report [Docket No. 156];

- ***Removal Order***. Preparing, filing, and obtaining court approval to enlarge the period within which the Debtor may remove civil actions [Docket No. 508];

- ***KEIP/KERP Order***. Preparing, filing, and obtaining approval of the Debtor's key employee retention program for certain critical non-insider employees and its key employee incentive program for six key executive insider employees [Docket No. 216];

- ***Committee Engagement***. Engaging meaningfully with the Equity Committee and Creditors' Committee and its advisors on a regular basis to ensure appropriate equity and creditor oversight and opportunity for input and participation in this Chapter 11 Case, including by executing non-disclosure agreements, working diligently and continuously to provide both committees with appropriate access to information on a voluntary and consensual basis, addressing and responding to disputes with the Equity Committee, and conducting periodic advisor calls to provide detailed updates and address information requests;

- ***Stakeholder Engagement***. Responding to numerous inquiries from stakeholders and other parties in interest related to the status of this Chapter 11 Case, specific contract counterparty demands and issues, and other matters related to ongoing operations and the administration of this Chapter 11 Case; and

- ***Retention of Professionals***. Preparing, filing, and obtaining Court approval of several retention applications for the Debtor's professionals.

**C. Bidding Procedures and Sale Process**

16. Since the outset of this Chapter 11 Case, the Debtor has conducted an extensive marketing and sale process designed to maximize value for all stakeholders. In connection with its sale process, the Debtor has, among other things:

- ***Bidding Procedures Order***. Prepared, filed, and obtained approval of the Debtor's motion seeking approval, among other things, of certain procedures (the "**Bidding Procedures**") for the sale or sales of the Debtor's assets, the Debtor's entry into two stalking horse purchase agreements, and the establishment of, among other deadlines, August 4, 2026 as the bid deadline (the "**Bid Deadline**") and, if necessary, August 10, 2026 as the date of the auction (the "**Auction**") [Docket No. 122];

- ***Competitive Auction***. Conducted a competitive Auction on August 10, 2026 in accordance with the Bidding Procedures, which continued over two days and involved multiple rounds of bidding among qualified bidders;

- ***Consummation of Sale Transactions for Certain Assets***. Obtained approval of and successfully closed four sale transactions for certain of the Debtor's assets, which collectively generated over $163 million in cash proceeds, plus $100 million in milestone payments. *See* Docket Nos. 356, 358, 362, 426, 436, 468; and

- ***Ongoing Remaining Assets Marketing Process***. Following the Auction, the Debtor has continued to market its remaining assets, including by extending the bid deadline for receipt of bids for such assets and continuing discussions, in collaboration with the Equity Committee, with interested parties regarding potential transactions.

### D. Negotiations Regarding a Chapter 11 Plan

17. In accordance with the Bidding Procedures, and in parallel with the Debtor's efforts to market its assets, the Debtor has since the start of this case solicited bids for a plan sponsor reorganization transaction (a "**Plan Sponsor Alternative Bid**"). By the Bid Deadline, the Debtor had received only one Plan Sponsor Alternative Bid from FSI (the "**FSI Plan Sponsor Bid**"). In order to provide the Debtor with maximum flexibility in pursuing bids for its remaining assets and a potential plan sponsor transaction, following the conclusion of the Auction, the Debtor initially extended the Bid Deadline to August 31, 2026. The Equity Committee opposed this extended timeline and ultimately filed an emergency motion with the Court requesting a further extension of the Bid Deadline. *See* Docket No. 387. Thereafter, the Debtor engaged in extensive good-faith, arm's-length discussions with the Equity Committee, the Creditors' Committee, and the DIP Lender regarding a consensual process for receipt of Plan Sponsor Alternative Bids and bids for the sale of the remaining assets. Those negotiations resulted in a consensual timeline for marketing and evaluating additional proposals that would permit the Debtor to receive bids through and including the confirmation of a chapter 11 plan. *See* Docket No. 393.

18. Thereafter, the Debtor engaged in discussions with FSI and the Equity Committee regarding ways to improve the FSI Plan Sponsor Bid to maximize value for equity holders. Those discussions included the exchange of multiple rounds of counter proposals addressing key economic and structural aspects of the FSI Plan Sponsor Bid in an effort to maximize value for equity holders. The Equity Committee expressed concerns regarding the value attributed to the Debtor's remaining assets under the FSI Plan Sponsor Bid and, together with the Debtor, engaged

in good-faith negotiations with FSI in an effort to improve the proposal for the benefit of equity holders. Ultimately, by late September, despite the parties' efforts, it became clear that consensus could not be reached on value and other terms that would enable a consensual plan sponsor transaction with FSI. The Debtor therefore determined that pursuing the FSI proposal on a non-consensual basis was not in the best interests of the estate because doing so would likely result in costly and protracted litigation to the detriment of all stakeholders.

19. In parallel with negotiations concerning the FSI Plan Sponsor Bid, the Debtor and the Equity Committee received and evaluated additional non-binding plan sponsor proposals and engaged in discussions, negotiations, and diligence with proponents of such alternatives. With the blessing and cooperation of the Debtor, the Equity Committee is also engaged in additional marketing efforts seeking plan sponsor bids. These efforts have generated interest from a number of additional parties, several of whom have entered into confidentiality agreements and are actively engaged in discussions with the Debtor and the Equity Committee regarding potential transactions. Additionally, throughout this process, the Debtor has continued to engage constructively with the Equity Committee regarding the terms of a chapter 11 plan with the goal of identifying a value-maximizing path forward that will permit the Debtor and the Equity Committee to submit a jointly proposed plan. To date, despite considerable disputes, these discussions with the Equity Committee remain productive and are ongoing, and resulted in an in-person, multi-hour meeting held on October 14, 2026 at Cooley's offices in New York. At that meeting, the Debtor expressed its support and wish to collaborate with the Equity Committee to develop and pursue transaction structures that will maximize value for all stakeholders and have the support of the Equity Committee. On the basis of this support, the Equity Committee agreed not to oppose the relief sought in this Motion.

20. The Debtor therefore requires additional time to continue evaluating all potential paths for a value-maximizing restructuring transaction, including collaborating with the Equity Committee on a consensual, jointly proposed plan. As such, the Debtor has filed this Motion to maintain exclusivity while those efforts remain ongoing and to avoid the disruption, distraction, and additional expense that could result from competing plan proposals.

## BASIS FOR RELIEF

### A. Section 1121(d) Permits this Court to Extend the Exclusivity Periods for "Cause"

21. Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a plan (the "**Filing Exclusivity Period**"). 11 U.S.C. § 1121(b). Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Filing Exclusivity Period, it has an initial period of 180 days after the commencement of the chapter 11 case to obtain acceptance of such plan (the "**Soliciting Exclusivity Period**," and together with the Filing Exclusivity Period, the "**Exclusivity Periods**"). 11 U.S.C. § 1121(c)(3). Accordingly, unless extended, the Debtor's Filing Exclusivity Period and Soliciting Exclusivity Period will expire on October 21, 2026 and December 21, 2026,[7] respectively.

22. The Exclusivity Periods are intended to afford a debtor the opportunity to propose a plan and to solicit acceptances of the plan without the deterioration of, and the disruption to, the debtor's business operations that might be caused by the filing of competing plans by third parties. Section 1121(d) of the Bankruptcy Code allows the Bankruptcy Court to extend the Exclusivity Periods "for cause." Specifically, section 1121(d) of the Bankruptcy Code provides:

---

[7] Pursuant to Rule 9006(a)(1)(C) of the Bankruptcy Rules, when the last day of a period falls on a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next business day. The date that is exactly 180 days following the Petition Date is December 20, 2026, a Sunday. Monday, December 21, 2026, is the immediately following business day.

(1) Subject to paragraph (2), on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

(2)

(A) The 120-day period specified in paragraph (1) may not be extended beyond a date that is 18 months after the date of the order for relief under this chapter.

(B) The 180-day period specified in paragraph (1) may not be extended beyond a date that is 20 months after the date of the order for relief under this chapter.

11 U.S.C. § 1121(d).

23. It is well established that the decision to extend the Exclusivity Periods is left to the sound discretion of the bankruptcy court and should be based upon the facts and circumstances of the particular case.[8] *See First Am. Bank of N.Y. v. Sw. Gloves and Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986); *In re Reetz*, 61 B.R. 412, 414 (Bankr. W.D. Wis. 1986). Although the Bankruptcy Code does not define "cause" for purposes of extensions to Exclusivity Periods, courts have looked to the legislative history of section 1121(d) of the Bankruptcy Code for guidance. *See In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989); *In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). Indeed, courts have found that Congress did not intend the 120- and 180-day periods to be a hard and fast rule. *See Amko Plastics*, 197 B.R. at 77 (observing that Congress intended courts to have flexibility in dealing with extensions of exclusivity); *Gaines v. Perkins (In re Perkins)*, 71 B.R. 294, 297 (W.D. Tenn. 1987) ("The hallmark of [] [Section 1121(d)] is flexibility."). Rather, Congress intended the Exclusivity

[8] Although the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("**BAPCPA**") amended section 1121(d) of the Bankruptcy Code by prohibiting extensions of the Filing Exclusivity Period and Soliciting Exclusivity Period beyond eighteen (18) and twenty (20) months of the petition date, respectively, there was no revision to the standards for obtaining interim extensions. Accordingly, pre-BAPCPA case law continues to apply and must be examined in the context of the Chapter 11 Case.

Periods to be of an adequate length, given the circumstances, for a debtor to formulate, negotiate, and draft a viable plan of reorganization, which by definition means one supported by some or all of a debtor's key constituents, without the disruption to its business that would occur with the filing of competing plans. *See Geriatrics Nursing Home v. First Fid. Bank, N.A.*, 187 B.R. 128, 133 (D.N.J. 1995) ("The opportunity to negotiate its plan unimpaired by competition, the court held, is meant to allow the debtor time to satisfy all creditors and win support for its restructuring scheme and thus ensure its survival as a business.").

24. Courts have relied on each of the following factors, among others, in determining whether cause exists to extend the Exclusivity Periods: (i) the size and complexity of the case ("**Factor 1**"); (ii) the necessity of sufficient time to negotiate and prepare adequate information ("**Factor 2**"); (iii) the existence of good faith progress toward reorganization ("**Factor 3**"); (iv) whether the debtor is paying its debts as they come due ("**Factor 4**"); (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan ("**Factor 5**"); (vi) whether the debtor has made progress in negotiating with creditors ("**Factor 6**"); (vii) the length of time the case has been pending ("**Factor 7**"); (viii) whether the debtor is seeking the extension to pressure creditors ("**Factor 8**"); and (ix) whether unresolved contingencies exist ("**Factor 9**"). *See, e.g., Cont'l Cas. Co. Am. Cas. Co. v. Burns & Roe Enters., Inc.*, Nos. 05-2529 (KSH), 05-4125 (KSH), 2005 WL 6289213, at *5 (D.N.J. Nov. 2, 2005); *In re Gibson*, 101 B.R. at 409-10 (E.D.N.Y. 1989); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re Express One Int'l Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *In re Grand Traverse Dev. Co. Ltd. P'ship*, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992); *In re Sw. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 451-54 (Bankr. W.D. Tex. 1987).

25. Notably, not all of the above factors are relevant to every case and courts may

consider the relevant subset of factors to determine whether cause exists to grant an exclusivity extension in a particular chapter 11 case. *See, e.g.*, *Express One.*, 194 B.R. at 100-01 (identifying four of the factors as relevant in determining whether "cause" exists to extend exclusivity); *In re United Press Int'l, Inc.*, 60 B.R. 265, 269 (Bankr. D.D.C. 1986) (finding that the debtor showed "cause" to extend exclusivity based on a subset of the factors listed above, including the complexity of the case and the debtor's progress towards confirmation); *In re Pine Run Tr., Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) (relying on two factors in holding that cause existed to extend exclusivity).

**B. Cause Exists for an Extension of the Exclusivity Periods**

26. The relevant factors here demonstrate that there is more than sufficient cause to approve the extension of the Exclusivity Periods.

**(i) The Size and Complexity of the Case (Factor 1)**

27. The size and complexity of this Chapter 11 Case weighs strongly in favor of extending exclusivity. In considering whether the size and complexity of a case supports an extension of exclusivity, courts have considered the revenue generated by the debtor, the size and complexity of its operations, the time the debtor has been in bankruptcy, and the contentiousness of the issues in dispute. *See In re Serv. Merch. Co.*, 256 B.R. 744, 751-52 (Bankr. M.D. Tenn. 2000) (finding a retailer with operations in multiple states, significant revenue, and various leases to be considered a large and complex case requiring tremendous coordination to administer); *see also In re R&G Props.*, No. 08-10876, 2009 WL 269696, at *1 (Bankr. D. Vt. Jan. 28, 2009) ("The Court finds that the amount, contentiousness, and nature of the litigation in this case, compressed as it was into a very short time, makes this first factor relevant and causes it to weigh in favor of an extension of time."); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 675 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 112 (S.D.N.Y. 2006) (explaining that where the "size and complexity of the

Debtors' case[] has been evident from [its] inception," this factor weighs in favor of maintaining exclusivity).

28. The size and complexity of the Debtor's Chapter 11 Case has been evident from its inception. The Debtor entered bankruptcy with specialized pharmaceutical programs at various stages of development and negotiations with the Stalking Horse Bidders and other parties already underway. During the early stages of this Chapter 11 Case—in addition to stabilizing its businesses and complying with its chapter 11 obligations—the Debtor engaged in a comprehensive sale process for its assets, including with respect to Plan Sponsor Alternative Bids. This process included extensive due diligence, hard-fought negotiations among sophisticated parties, and a competitive auction for certain of its assets.

29. While the Debtor has made substantial progress to date, significant work remains. The Debtor, together with the Equity Committee, continues to market its remaining assets and evaluate potential Plan Sponsor Alternative Bids while engaging with key stakeholders regarding the terms of a chapter 11 plan. Those efforts require the resolution of several complex issues relating to, among other things, (i) the treatment of equity holders and other stakeholders under a chapter 11 plan, (ii) the review, reconciliation, and resolution of creditor claims, (iii) the preservation of the Debtor's tax attributes for the benefit of the equity holders post-emergence from chapter 11, and (iv) the monetization of the Debtor's remaining assets.

30. Given the complexity of the Debtor's business and the ongoing efforts required to reach a consensual path forward to emergence from chapter 11, the size and complexity of this Chapter 11 Case weighs strongly in favor of extending the Exclusivity Periods.

**(ii) The Necessity of Sufficient Time to Negotiate and Prepare a Plan of Reorganization; The Existence of Good Faith Progress Toward Reorganization; Whether the Debtor has Demonstrated Reasonable Prospects for Filing a Viable Plan; and Whether the Debtor Has Made Progress in Its Negotiations With Its Creditors; (Factors 2, 3, 5, and 6)**

31. Factor 2, Factor 3, Factor 5, and Factor 6 all weigh heavily in favor of extending exclusivity. Courts have found these factors support extending the Exclusivity Periods where the Debtor has made "substantial efforts" to stabilize its business and been active in its chapter 11 case, where the Debtor is engaged in ongoing negotiations with its stakeholders, and where negotiations are expected to be commenced and concluded within a reasonable period of time. *See In re Borders Grp., Inc.*, 460 B.R. 818 (Bankr. S.D.N.Y. 2011) (granting the debtors' motion to extend its exclusive periods over an objection where the debtors had made "substantial efforts" to stabilize the business.); *In re Gialamas*, No. 18-13341, 2019 WL 2714829, at *3 (Bankr. W.D. Wis. June 27, 2019) (granting exclusivity extension motion and noting that "the Debtor has been active in this case . . . has filed schedules, applied for the employment of professionals, responded to three motions for stay relief and requested a claims bar date"); *In re Burns & Roe Enters., Inc.*, No. 00-41610, 2005 WL 6289213, at *5 (D.N.J. Nov. 2, 2005) (upholding the lower court's analysis that the debtor was making good-faith progress due to settlement efforts and ongoing negotiations between the debtor and creditors); *In re Swatara Coal Co.*, 49 B.R. 898, 899 (Bankr. E.D. Pa. 1985) (finding the Debtor had demonstrated reasonable prospects for filing a chapter 11 plan where "there is a reasonable possibility that the proposed negotiations will be commenced and concluded within a reasonable period of time").

32. Courts have also recognized the importance of affording debtors sufficient time to negotiate their chapter 11 plan without interference from competing alternatives. *See in re Fountain Powerboat Indus., Inc.*, No. 09-07132-8, 2009 WL 4738202, at *5 (Bankr. E.D.N.C. Dec. 4, 2009) (recognizing "the importance of providing the Debtor some breathing room to

negotiate with the parties without a competing plan to undermine its efforts”).

33. Since the commencement of this Chapter 11 Case, the Debtor has, among other things: (i) stabilized its business by obtaining approval of first day motions, (ii) obtained approval of debtor in possession financing, (iii) filed its schedules of assets and liabilities and statements of financial affairs, (iv) established a deadline for creditors to file proofs of claim in the Chapter 11 Case, and (v) diligently pursued multiple avenues to maximize value for its stakeholders through the Debtor’s sale process. The Debtor, together with the Equity Committee, continues to market its remaining assets and solicit potential Plan Sponsor Alternative Bids to ensure all potential paths to maximize value for equity are considered. The Debtor also continues to engage constructively with the Equity Committee regarding potential chapter 11 plan structures, with a view toward formulating a consensual chapter 11 plan that garners the support of the Equity Committee and maximizes value for all stakeholders. In light of these ongoing efforts, the Equity Committee does not oppose the requested extension of the Exclusivity Periods while the parties continue to evaluate and develop transaction alternatives that could serve the basis of a jointly proposed chapter 11 plan.

34. The Debtor’s efforts, together with the Equity Committee, to market its remaining assets, evaluate Plan Sponsor Alternative Bids, and negotiate a chapter 11 plan remain ongoing. Allowing exclusivity to lapse at this stage could disrupt those efforts by introducing competing plans before the Debtor and Equity Committee have completed its evaluation of available alternatives, causing further complication, cost, and delay to the detriment of equity holders’ recovery. Accordingly, the Debtor’s substantial progress to date, its ongoing efforts to develop a chapter 11 plan, and the work that remains to be completed each weigh strongly in favor of extending the Exclusivity Periods.

**(iii) The Debtor is Paying its Debts as they Come Due (Factor 4)**

35. Courts have found that where debtors have "consistently met their financial obligations," this factor "plainly doesn't warrant terminating exclusivity." *In re Adelphia Commc'ns Corp.*, 352 B.R. at 588. The Debtor has paid, and will continue to pay, bills as they come due. Moreover, as discussed above, the sale transactions generated substantial proceeds and have positioned the Debtor to satisfy all allowed administrative, priority, and general unsecured claims in full, while providing the Debtor with flexibility to evaluate restructuring alternatives that preserve the value of its tax attributes for stakeholders. As such, Factor 4 weighs in favor of extending the Exclusivity Periods.

**(iv) The Amount of Time That Has Lapsed in the Case (Factor 7)**

36. The amount of time that has lapsed in this Chapter 11 Case weighs strongly in favor of extending exclusivity. Courts have found that Factor 7 weighs in favor of extending the Exclusivity Periods where, like here, the Debtor is seeking its first extension only a few months into the case. *See R&G Props,* 2009 WL 269696, at *3 ("This chapter 11 debtor has been under the protection of Title 11 for approximately four months and is now seeking its first extension of the exclusivity period [. . . t]hese circumstances weigh in favor of an extension."). In fact, courts have found that there are virtually no cases where "a debtor has failed to establish sufficient cause to extend the original 120 day exclusivity period." *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987). Accordingly, this factor weighs in favor of extending the Exclusivity Periods.

37. This Chapter 11 Case has been pending for less than four months, and the Debtor is seeking only its first extension of exclusivity. During this relatively short period, the Debtor has administered the Chapter 11 Case, negotiated and obtained debtor-in-possession financing, conducted a comprehensive marketing and sale process, obtained approval of and consummated

sales of certain of its assets, and engaged key stakeholders in negotiations regarding a chapter 11 plan. Importantly, the Debtor and the Equity Committee are collaborating at this time to formulate a consensual plan that could be jointly proposed by the Debtor and the Equity Committee. Given the scope of those efforts, the current spirit of collaboration between the Debtor and the Equity Committee, and the significant progress achieved to date, the Debtor has not had an unreasonable amount of time in which to propose and solicit a chapter 11 plan.

**(v) The Debtor is Not Seeking the Extension to Pressure Creditors (Factor 8)**

38. The Debtor is requesting an extension of the Exclusivity Periods so it can continue its negotiations with stakeholders regarding a value-maximizing path forward. Courts have found that such efforts do not constitute pressuring creditors, but rather are consistent with the goals of chapter 11 and weigh in favor of granting extensions of exclusivity. *See In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014) ("The Bankruptcy Code recognizes, however, that the initial 120-day period may not be sufficient, and grants a court the power to extend exclusivity for 'cause' shown [. . . t]he Bankruptcy Code does not define "cause," but the legislative history indicates that the relevant factors include […] whether the debtor is using exclusivity as a tactical device to pressure the parties in interest to yield to a plan they consider unsatisfactory."); *In re R&G Props.*, 2009 WL 269696, at *3 (finding that attempts by the debtor to negotiate with its creditors was a salutary effort that is wholly consistent with how chapter 11 should work; it does not constitute what this Court finds to be an effort "to pressure creditors to submit to the debtor's reorganization demands").

39. Far from pressuring creditors or other stakeholders by stalling behind the safeguards of exclusivity, the Debtor has diligently worked to advance this Chapter 11 Case and to determine the best approach to setting forth a value-maximizing restructuring. Indeed, the Debtor has received proposals from parties in interest, including the Equity Committee, with whom

the Debtor has engaged extensively. The Debtor expects that engagement to only increase and accelerate in the coming weeks as the parties seek to develop a jointly proposed chapter 11 plan. The Debtor's request for an extension is intended to preserve the progress achieved to date and allow the Debtor to continue evaluating alternatives and building stakeholder consensus regarding a value-maximizing chapter 11 plan. Permitting exclusivity to lapse at this stage would create the potential for competing plans that could disrupt ongoing discussions, increase administrative costs, and delay the efficient resolution of this Chapter 11 Case, to the detriment of the estate and its equity holders and creditors.

40. The Debtor therefore seeks an extension not to pressure any constituency to accept a particular outcome, but rather to provide sufficient time to continue exercising its exclusive right to formulate a chapter 11 plan while working collaboratively with the Equity Committee to build consensus on a chapter 11 plan that maximizes value for the benefit of all stakeholders. Accordingly, Factor 8 weighs in favor of extending the Exclusivity Periods.

41. For the reasons stated above, the Debtor submits that the relief requested herein is appropriate and in the best interests of its estate and its stakeholders.

**NOTICE**

42. The Debtor has provided notice of this Motion to the following parties or their respective counsel: (i) the U.S. Trustee; (ii) counsel to the Creditors' Committee; (iii) counsel to the Equity Committee; (iv) counsel to FSI; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission; (vii) the United States Attorney's Office for the District of Delaware and all other states in which the Debtor operates; and (viii) any such other party entitled to receive notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

**<u>NO PRIOR REQUEST</u>**

43. No previous request for the relief sought herein has been made by the Debtor to this or any other court.

**<u>CONCLUSION</u>**

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court grant the relief requested in this Motion, the Proposed Order, and such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: October 21, 2026
Wilmington, Delaware

Respectfully submitted,

*/s/ James F. McCauley*
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
James F. McCauley (No. 6991)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Emails: defranceschi@rlf.com
steele@rlf.com
schlauch@rlf.com
mccauley@rlf.com

-and-

Cullen D. Speckhart
Lauren A. Reichardt
Miriam Peguero Medrano
**COOLEY LLP**
55 Hudson Yards
New York, NY 10001-2157
Telephone: (212) 479-6000
Emails: cspeckhart@cooley.com
lreichardt@cooley.com
mpegueromedrano@cooley.com

-and-

Robert L. Eisenbach III
**COOLEY LLP**
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Email: reisenbach@cooley.com

*Counsel for the Debtor and Debtor in Possession*